**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OMAR REYNOSO,                          C 11-4525 CW (PR)

     Plaintiff,              ORDER GRANTING DEFENDANTS' MOTION FOR
                         SUMMARY JUDGMENT AND DENYING
   v.                          PLAINTIFF'S MOTIONS TO COMPEL AND FOR
                         THE APPOINTMENT OF COUNSEL
M. SAYRE, et al.,
                         (Docket nos. 23, 26, 40)
     Defendants.

========================/

    Plaintiff, a state prisoner incarcerated at Pelican Bay State Prison (PBSP), filed this <u>pro se</u> civil rights action pursuant to 42 U.S.C. § 1983, alleging deliberate indifference to his serious medical needs and supplemental state law claims of medical negligence.  Defendants have filed a motion for summary judgment, Plaintiff has filed an opposition and Defendants have filed a reply.  Additionally, Plaintiff has filed motions to compel discovery and for the appointment of counsel.

    For the reasons discussed below, Defendants' motion for summary judgment is GRANTED and Plaintiff's motions are DENIED.

BACKGROUND

    The following facts are derived from Plaintiff's verified complaint and the attachments thereto, and the parties' papers in support of and in opposition to the motion for summary judgment and the declarations and exhibits submitted in support thereof.

    Plaintiff has been diagnosed with hypolordosis (decreased spine curvature) with degenerative disc disease, two budging discs and a disc protrusion of approximately seven millimeters.  As a result of his conditions he has severe pain in his lower back.  He

also has numbness, tingling and sharp pain down his left leg as an apparent result of damage to the peroneal nerve located in that leg.  Compl. ¶¶ 12-13.

Plaintiff was incarcerated at Centinela State Prison and Corcoran State Prison (Corcoran) prior to his transfer to PBSP. He alleges that while at both institutions doctors properly diagnosed his condition and he received proper medical care including diagnostic tests, consultation with an outside specialist, epidural spinal injections to block the pain, the prescription of pain medication, physical therapy and information about spinal surgery.  He contends, however, that since his arrival at PBSP Defendants have disregarded the medical opinions of those doctors and discontinued his treatment, leaving him in constant and severe pain.  Compl. ¶¶ 14-15.

Plaintiff arrived at PBSP on January 6, 2010.  Pursuant to California Department of Corrections and Rehabilitation (CDCR) policy, his existing prescriptions were continued for thirty days upon his arrival.  Specifically, Defendant Dr. Sayre, the Chief Medical Officer (CMO) at PBSP, authorized the continuation of Plaintiff's prescriptions for Enalapril Maleate (blood pressure medication), morphine 15 mg and Gabapentin (for nerve pain) until he could be seen by a primary care physician (PCP) and have his medications re-evaluated.  Decl. Michael Sayre Supp. Mot. Summ. J (Sayre Decl.) ¶ 4.

On January 28, 2010, Plaintiff was seen by Family Nurse Practitioner (FNP) Phillip Mallory.  Mallory documented his complaints of back and leg pain and noted that his use of morphine would be discussed with his PCP.  Mallory also discontinued

**United States District Court**
For the Northern District of California

Plaintiff's prescription for Gabapentin, because it is not an approved formulary medication for neuropathic pain at PBSP. Mallory instead prescribed Elavil (Amitrityline), which is a formulary medication prescribed for neuropathic pain.  Decl. Phillip Mallory Supp. Mot. Summ. J. (Mallory Decl.) ¶ 2.

On February 5, 2010, Mallory met with Plaintiff again and told him that custody staff had observed him on multiple occasions running and playing handball out on the yard and had provided video camera footage to Mallory of those activities.  Mallory discussed the video with Plaintiff and asked him how he was able to participate in such activities in view of his subjective reports of pain and inability to perform daily activities. Plaintiff explained that the reason he was able to perform daily activities was because, at the time, he was on strong pain medication (morphine), without which he would not have been able to perform these activities.  Mallory informed Plaintiff that the morphine was just "masking" his pain, and that the pain was his body's way of helping to avoid further injury.  Mallory told Plaintiff that his use of narcotics for pain management would be discontinued.  Plaintiff objected that doing so would cause him to suffer undue pain.  Nevertheless, Mallory discontinued Plaintiff's morphine prescription and, instead, prescribed Naproxen (a non-steroidal anti-inflammatory medication) 500 mg twice a day, in addition to the previously-prescribed Elavil.  Mallory Decl. ¶ 3.

Plaintiff alleges that, on February 23, 2010, he filed an inmate appeal of Mallory's decision to which he attached copies of his results from MRI and EMG tests taken in April 2009, which evidence that he has a chronic back condition.  He states that the

United States District Court
For the Northern District of California

appeal went unanswered and was never returned to him.  Compl. ¶ 19.

On February 26, 2010, Mallory submitted a Comprehensive Accommodation Chrono to Dr. Sayre, requesting prescription glasses and a wedge pillow for Plaintiff.  According to Plaintiff, the wedge pillow was prescribed to him by the CMO at Corcoran to help him sleep by relieving the pressure on his lower back.  Compl. ¶ 42, Opp'n ¶ 28.  Dr. Sayre approved the prescription glasses but denied the wedge pillow because he is of the opinion that medical research has not supported the use of wedge pillows as an effective treatment for low back pain.  Sayre Decl. ¶ 5.

On May 30, 2010, Plaintiff filed an inmate appeal complaining of severe back pain.  In response, on June 29, 2010, he was seen by Defendant Dr. Nancy Adam, a PCP.  He asked Dr. Adam to reinstate the regimen of pain medication and physical therapy he had received at Corcoran.  Dr. Adam denied Plaintiff's requests; instead, she prescribed Gabapentin 600 mg, even though Plaintiff told her that it did not help his pain.  Compl. ¶ 21.

According to Defendants, during the appointment Dr. Adam noted the objective examination findings from Plaintiff's medical records, which included the April 2009 MRI showing mild disc protrusion and nerve impingement.  She prescribed a 300 mg dose of Gabapentin to be taken in the morning and a 600 mg dose to be taken at night to relieve his back pain, with a follow-up appointment in thirty days.  She also noted that a referral for a surgical consultation could be a "consideration."  Decl. Nancy Adam Supp. Mot. Summ. J. (Adam Decl.) ¶ 6.  Dr. Adam is of the opinion that, at the time she evaluated Plaintiff, his complaints

4

of back pain and leg numbness appeared to be inconsistent with the objective findings of the MRI.  Id. ¶ 7.

On August 23, 2010, Defendant Physical Assistant-Certified (PA-C) Laurie Thomas saw Plaintiff for the first time.  He told her that his condition was getting worse and his pain was increasing.  Specifically, he explained that the numbness, pain and tingling sensation in his left leg had increased, the pain in his lower back had become intolerable, he no longer could sleep on his back or stomach or sit to eat his meals because of his bulging discs, and it was difficult for him to sit to use the bathroom. Compl. ¶ 25.

Thomas examined Plaintiff and concluded that her findings were consistent with chronic low back pain with radicular neuropathy.  She increased his Gabapentin dosage to 600 mg twice a day and "discussed heat and cold modalities for relief of discomfort and provided him with a handout for stretches and ways to prevent back pain."  Decl. Laurie Thomas Supp. Mot. Summ. J. (Thomas Decl.) ¶ 4.  The following day, Thomas completed a Physician Request for Services that she forwarded to the Utilization Management Committee, requesting an evaluation of Plaintiff by a neurosurgeon for possible back surgery.  In Thomas's professional opinion, however, she did not believe he was a candidate for back surgery as there were no neurological changes that were limiting his activities of daily living.  On September 1, 2010, the committee denied the request for a neurosurgeon evaluation.  Id.

On September 13, 2010, Thomas saw Plaintiff in the clinic for his chronic care appointment to discuss his chronic conditions of

hypertension and Hepatitis C.  During this visit she refilled three of his prescriptions for hypertension and ordered urine and blood tests.  According to Plaintiff, Thomas told him that, per direct orders from Dr. Sayre, all of his other medications, including Gabapentin, were going to be discontinued.  Plaintiff objected and asked Thomas to compare his MRI results from 2007 and 2009, which showed an increase in the size of his bulging discs. Compl. ¶¶ 26-28.

On September 27, 2010, Thomas saw Plaintiff for complaints of lower back and knee pain.  Her assessment based on physical examinations and review of his medical records was chronic low back pain with neuropathy.  According to Thomas, Plaintiff's neuropathy, which was in his lower left leg, was not consistent with previous MRI findings for his spine as there was no correlation between his reported pain and numbness and the results of the MRI.  Specifically, the findings of the prior MRI of his spine showed some disc protrusion and mild nerve root impingement at the L4-L5 and L5-S1 levels of his spine, but the areas of his body in which he reported pain did not correlate with those vertebrae spaces.  Thomas Decl. ¶ 6.

On November 15, 2010, Thomas saw Plaintiff at sick call.  She informed him that his request for an MRI had been denied.  Compl. ¶ 28.  He asked Thomas for alternative back pain treatments, either surgery or epidural injections, based on the evaluation he had received while at Corcoran.  Thomas noted that his MRI results were inconsistent with his reports of pain and that he received physical therapy at Corcoran in 2009.  Plaintiff told Thomas that with forty-five minutes of physical therapy exercises he would get

United States District Court
For the Northern District of California

some relief from his symptoms.  Upon her examination of Plaintiff, Thomas noted that there was no change in his back from the prior exams.  Plaintiff told Thomas that the current prescription of Gabapentin 600 mg twice daily was not giving him any relief, so Thomas tapered him off of Gabapentin with 400 mg for fourteen days and prescribed a trial of Sulindac 200 mg twice daily for thirty days.[1]  She advised him that he needed to perform daily stretches, light exercise and learn to live with his current pain by adjusting his daily activities according to his pain level that day.  She also told him that his pain could not be alleviated completely.  He was given a pain assessment packet to complete, and Thomas told him that she would take his case to the Pain Management Committee for review and discussion, because prescriptions for any inmate taking narcotics, long-term non-steroidal anti-inflammatory medications or tricyclic medications must be reviewed by the Pain Management Committee on a regular basis.  Thomas Decl. ¶ 7.

At the Pain Management Committee meeting on December 10, 2010, Plaintiff's current medications, complaints and MRI and physical examination findings were reviewed. The committee expressed concern about the amount of pain medication he was taking in light of his hypertension and Hepatitis C and suggested that his medications be regulated and prescribed in small amounts. Thomas Decl. ¶ 7.

Thomas next saw Plaintiff on January 31, 2011, for complaints

---

[1] Sulindac is a non-steroidal anti-inflammatory drug.

**United States District Court**
For the Northern District of California

of left knee pain.  Her examination revealed a very mild limp favoring the left that got better with every step.  Her findings were consistent with left knee pain with "known medial meniscal tear" from Plaintiff's prior knee surgery in 2007.  Thomas referred him to the Utilization Management Committee for an evaluation of his left knee by an orthopedic surgeon.  The committee denied the request on February 9, 2011, because it did not meet the standardized InterQual criteria.[2]  Thomas Decl. ¶ 8.

On March 16, 2011, Thomas saw Plaintiff at sick call for complaints of back and knee pain.  She told him that the orthopedic consult for his knee had been denied.  After conducting an extensive review of his file, she noted that his treatments with morphine, Neurontin (Gabapentin) and Tylenol #3 (with Codeine) had all failed, that Ibuprofen, Naproxen, Tylenol and Sulindac "all tear up his stomach and did not help," and that the Utilization Management Committee at Corcoran had denied two requests for a consultation with a neurosurgeon in 2009.  She considered a Utilization Management referral for physical therapy, but after reviewing the results of Plaintiff's physical therapy treatments in 2009 saw that the treatments did not have an impact.  She spoke with Plaintiff at length about back stretches and informed him that no surgical intervention was warranted unless there was new trauma or injury to his back or knee, because he did not meet the standardized InterQual criteria.  Thomas Decl. ¶ 10.

On May 20, 2011, Dr. Sayre discontinued Plaintiff's chrono

---

[2] The InterQual standardized criteria are objective criteria used in both private and community settings to evaluate and determine the need for diagnostic testing and treatment.  Thomas Decl. ¶ 8.

United States District Court
For the Northern District of California

for a wedge pillow, which Plaintiff maintains helps him sleep by relieving the pressure on his lower back. He claims this was done in retaliation for his telling medical staff that he had no option left but to file a lawsuit to obtain proper medical care. Compl. ¶ 42 & Ex. F.[3] According to Plaintiff, the wedge pillow is not a financial burden on the CDCR because he paid for it with his trust account money. Opp'n ¶ 28 & Ex. 30.

Plaintiff was moved to a different housing unit at PBSP and was seen by a new PCP, Dr. Ikegbu, on May 27, 2011. After evaluating him and reviewing his medical file, Dr. Ikegbu prescribed a trial of a "steroid boost" for five days to relieve inflammation, referred him for physical therapy and to the chronic pain management team for evaluation, and prescribed Naproxen 500 mg twice a day. Opp'n ¶ 8 & Ex. 6. Plaintiff attended physical therapy sessions on June 15 and 29, 2011. During the sessions, the physical therapist discovered that his left leg is more than one inch longer than his right leg, but did not know if this was aggravating his condition. At the second session, the physical therapist told him that physical therapy would not benefit him because it would not fix the disc damage. He wrote in his discharge summary that Plaintiff should continue to report to his physician if his symptoms did not change and that "injections and surgery are viable next steps." Opp'n ¶ 9 & Ex. 7 at 100.

---

[3] The evidence concerning Plaintiff's possession of the wedge pillow is disputed. Plaintiff states that after he first arrived at PBSP in February 2010, Dr. Sayre approved his continued use of the wedge pillow, which had been prescribed by a doctor at Corcoran, and he used the pillow from his arrival at PBSP until May 20, 2011. Compl. ¶ 42, Opp'n ¶ 28. According to Dr. Sayre, however, he discontinued Plaintiff's use of the wedge pillow on February 26, 2010, Sayre Decl. ¶ 5 & Ex. A (DEF 000730), and again on May 20, 2011, id. ¶ 8 & Ex. A (DEF 000727).

United States District Court
For the Northern District of California

When Dr. Ikegbu was reassigned, Plaintiff returned to the care of PA-C Thomas.  On November 14, 2011, Thomas saw Plaintiff at sick call for back pain and lower left leg numbness radiating to the ankle and toes.  Her physical examination of him was essentially normal. She noted that the numbness in his leg might be related to his prior knee surgeries because his EMG results stated that the tingling in his calf first started after his first knee surgery in 2007.  Noting that he had not tried Salsalate for back pain, she prescribed Salsalate 500 mg for thirty days[4] and recommended moist compresses to the low back and yoga and self-massage. Thomas refilled the prescription for Salsalate on February 3, 2012.  Thomas Decl. ¶ 13.

On March 20, 2012, Thomas saw Plaintiff for both chronic care and a sick call appointment.  Plaintiff told her that the numbness in his left calf was worsening.  Thomas conducted a physical examination and noted an essentially normal back exam but decreased sensation in the lower lateral one-third of Plaintiff's left calf, top of foot and medial first and second toes, consistent with peroneal nerve involvement.[5]  Thomas prescribed a trial of Nortriptyline for his leg symptoms,[6] advised him to continue yoga and self-massage, and ordered the nurse to follow up for leg length measurements because no documentation was found

---

[4] Salsalate is a non-steroidal anti-inflammatory drug.

[5] The peroneal nerve is found on the outside part of the lower knee. This nerve is responsible for transmitting impulses to and from the leg, foot, and toes.

[6] Nortriptyline is a tricyclic anti-depressant that is also used for neuropathic pain.

regarding any discrepancies.  Thomas Decl. ¶ 14.

On May 4, 2012, Thomas noted that Plaintiff had submitted a health care request to the nurse stating that the pain medication prescribed for the peroneal nerve was ineffective; consequently, Thomas discontinued the Nortriptyline.  Thomas Decl. ¶ 15.

On May 21, 2012, Thomas saw Plaintiff at sick call for complaints of back pain and numbness in his lower left leg. Thomas examined him, noting the left calf numbness and a normal back exam.  Thomas spent approximately forty minutes with Plaintiff and advised him that no treatment alternatives were available because he had no benefit with the available oral medications, he is not a surgical candidate for his back and his request for epidural injections had been denied.  Thomas Decl. ¶ 16.

On May 22, 2012, Dr. Adam was contacted after Plaintiff reported that his back had "locked" and his lower extremities were numb. She prescribed 500 mg of Methocarbamol[7] and two tablets of Tylenol #3 with codeine.  Adam Decl. ¶ 9 & Ex. D.

On September 12, 2012, Thomas saw Plaintiff for his chronic care visit.  He complained that he felt a new pulling sensation in his back and difficulty urinating with incomplete bladder emptying.  Thomas performed a back examination and digital rectal examination.  She found that both were normal.  To further evaluate him, she ordered an x-ray of Plaintiff's lumbosacral spine and left hip.  On October 9, 2012, she conducted a chart review of his blood pressure readings to determine if any

―――――――――――――――

[7] Methocarbamol is a muscle relaxant.

medication changes were necessary.  Thomas Decl. ¶ 17.

While Thomas was on vacation, Plaintiff reported a lower back pain flare-up at the end of October 2012.  He was seen by nursing staff on October 29 and Dr. Venes on October 31.  Dr. Venes found he had chronic lower back pain without alarming signs or symptoms with possible muscle spasm.  He was prescribed a temporary course of Methocarbamol and Ketorolac Tromethamine (an injectable anti-inflammatory) for two weeks and oral anti-inflammatories for two weeks.  Based on Thomas's knowledge and review of Plaintiff's medical conditions and records, she believes this was an appropriate course of treatment.  Thomas Decl. ¶ 18.

On November 7, 2012, Dr. Sayre, in his role as PBSP CMO, reviewed Plaintiff's medications and completed a "Notification to PCP of Change in Medication" for the Naproxen prescribed on October 30, 2012.  Dr. Sayre concluded that, after the prescription expired, the medication should not be renewed until Plaintiff was re-evaluated and reviewed by his PCP to determine whether continued administration of this medication was appropriate.  Dr. Sayre's concern was for possible complications involving Plaintiff's blood pressure and gastrointestinal system, which, in turn, could cause serious complications for his chronic conditions of hypertension and Hepatitis C.  Sayre Decl. ¶ 11.

On November 16, 2012, Thomas conducted a review of Plaintiff's left hip and lumbar spine x-rays and noted that the hip x-rays were normal with a 1 mm calcification, which is not clinically significant.  The x-rays of the lumbosacral spine showed lumbar spine spondylosis (narrowing of the spine) indicating arthritic changes in the spine, but no acute osseous

United States District Court
For the Northern District of California

(new formation of the bone) and no fractures or displacement of
vertebrae.  According to Thomas, "the degenerative changes noted
in the x-ray were consistent with 'wear and tear' on the back,
also called a 'mechanical' or arthritic back which no surgical
intervention would resolve or relieve."  Thomas Decl. ¶ 18.
Plaintiff maintains that the x-rays show disc space narrowing,
which can lead to possible nerve root entrapment, and also that
the x-rays do not show muscles, nerves or discs and, therefore,
should not be relied upon to diagnose his condition.  Opp'n ¶¶ 52-
53 & Exs. 41-42.

DISCUSSION

I.   Plaintiff's Motion to Compel

Plaintiff has filed a motion to compel Dr. Sayre's production
of documents and a response to an interrogatory to which Dr. Sayre
has asserted objections.  Dr. Sayre opposes the motion.

Under Rule 26 of the Federal Rules of Civil Procedure,
parties are entitled to discovery regarding any nonprivileged
matter that is relevant to any party's claim or defense, including
the existence, description, nature, custody, condition, and
location of any documents or other tangible things and the
identity and location of persons who know of any discoverable
matter.  Fed. R. Civ. P. 26(b)(1).  For good cause, the court may
order discovery of any matter relevant to the subject matter
involved in the action.  Relevant information need not be
admissible at the trial if the discovery appears reasonably
calculated to lead to the discovery of admissible evidence.  Id.

The court must limit access to discovery that is
"unreasonably cumulative or duplicative, or can be obtained from

13

some other source that is more convenient, less burdensome, or less expensive," Fed. R. Civ. P. 26(b)(2)(C)(i), or where "the burden or expense of the proposed discovery must be assessed in light of its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues," Fed. R. Civ. P. 26(b)(2)(C)(iii).

   A.   Request for Production of Documents, Set One, No. 8

   Plaintiff's Request for Production of Documents, Set One, No. 8, to Dr. Sayre states the following:

> In November of 2011 the District Attorney pressed charges against Defendant C.M.O. Sayre for property damage to a co-worker's vehicle and for false reports during the same incident, Plaintiff requests any and all police reports, incident reports, video footage, complaints, or other document(s) that may exist as a result of this incident that took place at Defendant's Sayre job-site here at Pelican Bay Prison.

Pl.'s Mot. Compel, Ex. 1 at 2.

   Dr. Sayre objected to the request as irrelevant and calling for documents that violate his right of privacy.  Defs.' Opp'n Mot. Compel, Ex. A at 2.

   Plaintiff maintains the documents are relevant to Dr. Sayre's credibility because Dr. Sayre has presented false medical information about his condition and symptoms in an attempt to minimize his need for treatment.

   The Court finds the requested information is not discoverable because it is not relevant to any claim or defense in this case. Dr. Sayre's involvement in the noted incident does not make the facts alleged by Plaintiff more or less probable and are of no consequence in determining whether Dr. Sayre acted with deliberate

14

indifference to Plaintiff's serious medical needs.  Accordingly, Plaintiff's motion with respect to this request for production is DENIED.

B.   Request for Production of Documents, Set One, No. 9

Plaintiff's Request for Production of Documents, Set One, No. 9, to Dr. Sayre requests the following:

> Any logs, lists, or other documentation reflecting grievances and lawsuit/complaints filed by Pelican Bay State Prison inmates from Jan-6-2010 to the date of your response.

Pl.'s Mot. Compel, Ex. 1 at 3.

Dr. Sayre objected to the request on the grounds that it is irrelevant, vague, overbroad, unduly burdensome and would violate the privacy rights of other inmates.  Defs.' Opp'n Mot. Compel, Ex. A at 1.

Plaintiff maintains that the request is relevant because he is attempting to discover whether a pattern of medical negligence and deliberate indifference to inmates' serious medical needs exists at PBSP, and that it is not overbroad because he is not seeking specific information from the grievances.  He suggests that "Defendants Counsel can simply look at and the P.B.S.P. records of all the grievances, complaints or lawsuits that have been filed from January 2010 to October 2012, and make a list of [them]" for Plaintiff's review.  Mot. Compel at 8.

In response, Dr. Sayre notes that Plaintiff's suggestion would require counsel to examine records pertaining to grievances filed by several thousand inmates over a thirty-four month period, and that Plaintiff has made no showing that this information is necessary to his claims against the four Defendants in this case.

The Court agrees that the request is overbroad and would

United States District Court

For the Northern District of California

impose an undue burden on Defendants.  Moreover, evidence of medical accusations and/or complaints made by other inmates is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence concerning Defendants' motive or intent with respect to their treatment of Plaintiff.  Plaintiff's claims against Defendants are based on his own medical treatment. Accusations of negligence and/or a violation of the Eighth Amendment or lawsuits filed by other inmates fail to evidence Defendants' liability toward Plaintiff.  Further, Plaintiff has not demonstrated that his need for the information, which concerns the medical care of other inmates, outweighs the privacy rights of Defendants and the inmates making the accusations.  Accordingly, Plaintiff's motion with respect to this request for production of documents is DENIED.

C.    Interrogatories to Dr. Sayre, Set One, No. 9

Plaintiff's interrogatory to Dr. Sayre, Set One, No. 9, asks the following:

> Have you made any statements in writing or verbally to
> any Pelican Bay physicians or to any one else for the
> matter, to the effect that the symptoms of pain,
> numbness, tingling, loss of sensations to lower-
> extremities experienced by the plaintiff are not caused
> by the 7mm nerve impingement on the Nerve root L5-S1,
> that there was no evidence of any involvement of S1
> nerve root. If you have made any statements in writing
> or verbally. Describe and explain "How you reached this
> conclusion?" and (sic) explain the basis for this
> conclusion.

Pl.'s Mot. Compel, Ex. 2 at 4.

Dr. Sayre objected to this interrogatory on the grounds that it is compound, contains a statement, assumes facts not in evidence, and is argumentative.  Defs.' Opp'n Mot. Compel at 5. Further, without waiving these objections, Dr. Sayre indicated that he did not recall any verbal statements regarding this issue,

nor could he locate documents that reflect this issue.  Id.

In his motion to compel, Plaintiff states that he already has evidence that Dr. Sayre did in fact make the alleged statements and is seeking additional information that may lead him to find other relevant documents.  In support of his argument, Plaintiff refers to his Exhibit 5, which is a memorandum that reflects answers provided by Dr. Sayre about Plaintiff's medical condition in response to questions asked by Steven Fama of the Prison Law Office.  Pl.'s Mot. Compel at 8 & Ex. 5.  Dr. Sayre maintains, however, that the memorandum does not contradict his answer to the interrogatory because he has responded to the best of his ability and still submits that he does not recall making verbal or written statements regarding the information Plaintiff sets forth in the interrogatory.  Defs.' Opp'n Mot. Compel, Ex. A at 3.

Dr. Sayre, by way of his attorney's signed response to Plaintiff's interrogatories, has complied with Rule 26 and certified that, "to the best of his knowledge, information and belief formed after a reasonable inquiry," he does not possess the information that Plaintiff seeks.  Fed. R. Civ. P. 26(g)(1)  He cannot be compelled to provide a different response.  Accordingly, Plaintiff's motion to compel Dr. Sayre's further response to the noted interrogatory is DENIED.

II.  Motion for Summary Judgment

A.  Legal Standard

Summary judgment is only proper where the pleadings, discovery and affidavits show there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those that may affect the outcome of the case.  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Id.

The court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Id. at 324 (citing Fed. R. Civ. P. 56(e)).

In considering a motion for summary judgment, the court must review the evidence in the light most favorable to the nonmoving party.  See Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999).  The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact.  See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

A district court may consider only admissible evidence in ruling on a motion for summary judgment.  See Fed. R. Civ. P. 56(e); Orr v. Bank of America, 285 F.3d 764, 773 (9th Cir. 2002). A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence.  See Schroeder v.

McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995).

B.   Deliberate Indifference Standard

Deliberate indifference to serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment.  See Estelle v. Gamble, 429 U.S. 97, 104 (1976); McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).  Serious medical needs include serious mental health needs.  See Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994).  A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical need, and the nature of the defendant's response to that need.  McGuckin, 974 F.2d at 1059.

A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.  Id.  The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment, the presence of a medical condition that significantly affects an individual's daily activities, or the existence of chronic and substantial pain are examples of indications that a prisoner has a serious need for medical treatment.  Id. at 1059-60.

A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it.  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,"

19

**United States District Court**

For the Northern District of California

but he "must also draw the inference." Id.  In order for

deliberate indifference to be established, therefore, there must

be a purposeful act or failure to act on the part of the defendant

and resulting harm.  See McGuckin, 974 F.2d at 1060.

Deliberate indifference may be shown when prison officials

deny, delay or intentionally interfere with medical treatment, or

it may be shown in the way in which they provide medical care.

See id. at 1062.  But neither a difference of opinion between a

prisoner-patient and prison medical authorities regarding

treatment nor a showing of nothing more than a difference of

medical opinion as to the need to pursue one course of treatment

over another is sufficient to establish deliberate indifference.

See Toguchi v. Chung, 391 F.3d 1051, 1059-60 (9th Cir. 2004).  In

order to prevail on a claim involving choices between alternative

courses of treatment, a plaintiff must show that the course of

treatment the doctors chose was medically unacceptable under the

circumstances, and that they chose this course in conscious

disregard of an excessive risk to the plaintiff's health.  Id. at

1058.

C.   Analysis

1.   Back Complaints

Plaintiff maintains that Defendants should have provided him

with surgery and/or epidural steroid injections to treat his

complaints of back pain.  In support of their motion for summary

judgment, Defendants have presented evidence that, based on their

considered medical evaluations, they determined that neither

surgery nor epidural steroid injections were appropriate for his

back condition.  Adam Decl. ¶ 5; Thomas Decl. ¶ 18.

In particular, Defendants have presented evidence which shows that Plaintiff's MRI study results were inconsistent with his reported symptoms.  Adam Decl. ¶ 7; Thomas Decl. ¶¶ 6, 20. Notably, a referral for a surgery consult made by Thomas was discussed by PBSP medical providers and the Utilization Management Committee, all of whom agreed that Plaintiff's symptoms were not consistent with his MRI findings, that is, there was no correlation between his reported pain and numbness and the results shown on the MRI.  Specifically, the MRI showed some disc protrusion and mild nerve root impingement at the L4-L5 and L5-S1 levels of his spine, but the areas of the body where Plaintiff complained of pain did not correlate with these L4-L5 and L5-S1 levels.  Thomas Decl. ¶ 6.  Moreover, x-ray studies confirmed arthritic changes in his back with no new bone formation, fractures or displacement of vertebrae.  Id. ¶ 18.  In sum, the MRI studies, x-rays and physical examinations of Plaintiff's back revealed that he suffered from a "mechanical" or arthritic back which cannot be resolved or relieved by surgery.  Id.

In support of their argument, Defendants have submitted the declaration of Dr. Bruce Barnett, a licensed physician who is employed by the CDCR as the CMO of the Receiver's Office of Legal Affairs.  His current duties include participation in the Receiver's process for reviewing medical care issues raised in various court actions.  He regularly reviews medical services provided to inmates in the context of applicable standards of care and offers guidance to healthcare providers.  He also directly cares for patients in the prisons on a part-time basis.  In 2010 he served on the CDCR committee that proposed guidelines for

management of inmates' chronic pain based upon authoritative medical research and recommendations.  Decl. B. Barnett Supp. Mot. Summ. J. (Barnett Decl.) ¶ 3.

According to Dr. Barnett, medical research has shown that MRI studies of the spine do not accurately or consistently correlate with back pain or disease; rather, the research has shown that many people with disc bulges or protrusions visible on MRIs have no symptoms at all.  Barnett Decl. ¶ 10; Barnett Decl. Supp. Reply ¶ 6.  He further attests that surgical treatment is generally not helpful for degenerative changes in the spine (i.e., the arthritic back), and that surgery in Plaintiff's case was especially inappropriate based on the inconsistencies between the objective findings and his subjective complaints.  Barnett Decl. ¶ 10.

Plaintiff asserts that back surgery will "fix" his back problems.  According to Dr. Barnett, however, even if Plaintiff was a candidate for back surgery there is extensive authoritative literature establishing that back surgery often fails to cure back pain and leaves patients worse off than before surgery.  Barnett Decl. Supp. Reply ¶¶ 6-7.

Plaintiff argues that Defendants should have ordered epidural steroid injections for his back.  However, according to Defendants' undisputed declarations, epidural steroid injections are no longer administered to inmate patients in the CDCR because of an abundance of medical literature which has found little to no benefit from such injections for chronic low back pain and attendant significant risks to the patient.  Barnett Decl. ¶ 14; Adam Decl. ¶ 5; Thomas Decl. ¶ 18.

Based on the above evidence, the Court finds that Plaintiff

**United States District Court**
For the Northern District of California

1  has not raised a triable issue of material fact with respect to

2  whether Defendants' decision to deny his requests for surgery or

3  epidural injections were medically unacceptable under the

4  circumstances and whether they chose this course of action in

5  conscious disregard of an exceptional risk to his health.

6  <u>Toguchi</u>, 391 F.3d at 1058.  Accordingly, Defendants are GRANTED

7  summary judgment on this claim.

8         2.    Wedge Pillow for Back Pain

9         Plaintiff claims that Dr. Sayre acted with deliberate

10 indifference to his serious medical needs by discontinuing his

11 chrono for a wedge pillow that had been prescribed by the CMO at

12 Corcoran.  He maintains that the wedge pillow helps him to

13 position himself more comfortably while in bed, enabling him to

14 sleep better.

15        Defendants contend Dr. Sayre acted reasonably because a wedge

16 pillow is not medically necessary for the treatment of Plaintiff's

17 back pain.  According to Title 15 of the California Code of

18 Regulations (CCR), Defendants can administer only health care that

19 is "medically necessary."  Medical necessity is determined by

20 assessment of the patient's medical needs in light of those

21 treatments which have been found to be medically indicated based

22 on objective medical studies ("outcome data") pursuant to CCR

23 Section 3350.2[8]  Barnett Decl. Supp. Reply ¶¶ 4, 9.  In Dr.

24 _____

25        [8] CCR Section 3350(b) defines these terms as follows:

26        (1) Medically Necessary means health care services that
       are determined by the attending physician to be
27     reasonable and necessary to protect life, prevent
       significant illness or disability, or alleviate severe
28     pain, and are supported by health outcome data as being
       effective medical care.

**United States District Court**
For the Northern District of California

Barnett's opinion, there is no objective evidence that a wedge pillow is "medically necessary" for Plaintiff as defined in CCR Section 3350. Specifically, Dr. Barnett does not dispute that a wedge pillow might be used by Plaintiff to make himself more "comfortable," but opines that there is insufficient support in the medical research for the proposition that a wedge pillow reduces back pain and, hence, is medically necessary. Barnett Decl. ¶ 16. Further, Defendants note that Plaintiff told Thomas that he was capable of sleeping on both sides and could turn to get into these positions. Thomas Decl. ¶ 16.

Based on the above evidence, the Court finds that Plaintiff has not raised a triable issue of material fact with respect to whether Dr. Sayre's decision to discontinue his chrono for a wedge pillow was medically unacceptable under the circumstances and whether he chose this course of action in conscious disregard of an exceptional risk to his health. Toguchi, 391 F.3d at 1058. Accordingly, Defendants are GRANTED summary judgment on this claim.

---

(2) Outcome Study means the definition, collection and analysis of comparable data, based on variations in treatment, concerning patient health assessment for purposes of improving outcomes and identifying cost-effective alternatives.

(3) Outcome Data mean statistics such as diagnoses, procedures, discharge status, length of hospital stay, morbidity and mortality of patients, that are collected and evaluated using science-based methodologies and expert clinical judgment for purposes of outcome studies.

1          3.   Medications

2       Plaintiff complains about Defendants' discontinuation of his

3   morphine prescription for pain relief.  He states that morphine

4   permits him to engage in normal activities.  However, no medical

5   or scientific evidence has been presented to support this claim.

6       According to Defendants' evidence, morphine is a highly toxic

7   and addictive opiate appropriately used only in unusual and

8   extreme circumstances for severe pain arising from anatomic

9   defects or diseases clearly identified as appropriate for such

10  therapy.  The goal in prescribing morphine is to ameliorate the

11  degree of extreme discomfort, not eliminate all barriers to normal

12  activity.  Barnett Decl. Supp. Reply ¶ 10.

13      Defendants attest that, in Plaintiff's case, the objective

14  evidence does not show that he has any anatomic defects or

15  diseases that require treatment with morphine.  Further, treatment

16  of his reported mechanical back pain with opiates such as morphine

17  would be ill-advised based on the medical evidence of his

18  condition.  Specifically, the risks of complications from

19  morphine--including sedation and death--are serious and

20  substantial, and there is no clinical benefit to such treatment.

21  Barnett Decl. ¶¶ 12-13; Barnett Decl. Supp. Reply ¶ 10.  Dr.

22  Barnett opines: "The physical examinations, diagnostic results and

23  evidence of Plaintiff's daily function provides ample basis for

24  defendants to appropriately engage in conservative treatment

25  strategies, and to avoid surgery, use of opiates or other

26  unnecessary and potentially dangerous medical treatment."  Barnett

27  Decl. Supp. Reply ¶ 11.

28      Additionally, Defendants present evidence that, based on

25

Plaintiff's chronic medical conditions of high blood pressure and Hepatitis C, the Pain Management Committee properly concluded that his medications must be carefully monitored at low doses. Consequently, his medical providers have treated him with short courses of narcotic medications for his complaints of acute episodes of back discomfort.  See Adam Decl. ¶ 9; Barnett Decl. ¶ 6.  The Pain Management Committee's conclusion applied to all of Plaintiff's prescriptions, not just morphine.  For example, at committee meetings in December 2010 and June 2011, it was recommended that Plaintiff's use of Naproxen be limited and kept at a lower dose.  Consequently, Thomas determined that she would wait for him to submit a request for healthcare services and address any pain issues as they arose, with the goal of reducing his Naproxen prescription to 250 mg, to be filled only on rare occasions for back pain flare-ups, in order to limit side effects from long term use and complications with his hypertension and Hepatitis C.  Thomas Decl. ¶¶ 10-11, 19, 21.

Notwithstanding these limitations, the evidence shows that Defendants have prescribed a number of other pain medications to try to manage Plaintiff's discomfort.  According to his self-reporting, however, all medications have proved ineffective. Notably, Thomas has prescribed a number of medications for his complaints, including Sulindac, Naproxen, Salsalate, Gabapentin, Tylenol #3, Nortriptyline and Amitriptyline.  However, Plaintiff has denied any benefit from Nortriptyline, Salsalate, Gabapentin and Tylenol #3, and claimed that Naproxen caused burning in his stomach and Amitriptyline caused numbing in his mouth.

Based on the above evidence, the Court finds that Plaintiff

United States District Court

For the Northern District of California

has not raised a triable issue of material fact with respect to whether Defendants' medication decisions were medically unacceptable under the circumstances and whether they chose their course of action in conscious disregard of an exceptional risk to his health.  Toguchi, 391 F.3d at 1058.  Accordingly, Defendants are GRANTED summary judgment on this claim.

### 4.  Knee Pain

Plaintiff alleges that knee surgery had been approved for him at Corcoran before his transfer to PBSP, and that Defendants' decision not to provide him with the surgery evidences their deliberate indifference to his medical needs.  Defendants present the following evidence in support of their argument that it is not medically necessary for him to see an orthopedic surgeon for consultation or repair of his knee.

Thomas saw Plaintiff on January 31, 2011, for complaints of left knee pain.  She noted that after previous arthroscopic knee surgery in 2007 he had complained of continued pain and a subsequent MRI revealed re-injury to the medial meniscus.  Her examination revealed a very mild limp favoring the left leg, which got better with each step, and that he was able to get on and off the table and bend to sit in the chair.  Her examination and findings were consistent with left knee pain with known medial meniscal tear.  Thomas referred Plaintiff to the Utilization Management Committee for evaluation of his left knee by an orthopedic surgeon.  The request was denied because it did not meet the InterQual standardized criteria used to evaluate and determine the need for diagnostic testing and treatment.  Thomas Decl. ¶ 10.  Specifically, the committee determined that

27

United States District Court
For the Northern District of California

1  Plaintiff's condition did not meet the criteria for an orthopedic
2  consult or repair because the examination indicated that his knee
3  was not unstable, which is the InterQual criterion required to
4  refer a patient for an orthopedic consult for the knee.   Sayre
5  Decl. ¶ 7.

6      Based upon Dr. Barnett's training and experience and his
7  review of the medical record, it is his professional opinion that
8  this determination was appropriate and consistent with the
9  standard of care for best practices.   There is substantial
10 evidence in Plaintiff's medical records to show that his knee is
11 stable and that he can engage in activities such as exercising for
12 an hour or more each day.   See Compl. Ex. 33; Pl.'s Decl. Supp.
13 Opp'n ¶ 38.   Consequently, Dr. Barnett opines, it would be
14 improper to perform surgery, and Defendants' decision to reject
15 Plaintiff's request for an orthopedic consultation and surgery is
16 consistent with the best practices as set forth in in the
17 InterQual guidelines and authoritative journals.   Barnett Decl.
18 Supp. Reply ¶ 16.

19     Based on the above evidence, the Court finds that Plaintiff
20 has not raised a triable issue of material fact with respect to
21 whether Defendants' treatment of his knee pain was medically
22 unacceptable under the circumstances and whether they chose their
23 course of action in conscious disregard of an exceptional risk to
24 his health.   Toguchi, 391 F.3d at 1058.   Accordingly, Defendants
25 are GRANTED summary judgment on this claim.

26         5.   Left Leg Pain

27     Plaintiff contends that Defendants failed to treat symptoms
28 of numbness and tingling in his lower left leg.   According to

**United States District Court**
For the Northern District of California

Defendants' evidence, Plaintiff has peroneal nerve damage that occurred after his knee trauma and subsequent surgery in 2007; this nerve damage is not related to his complaints of low back pain and cannot be cured.  The only possible treatment to alleviate the peroneal nerve discomfort is neuropathic pain medications.  Numerous medications have been prescribed for Plaintiff by Thomas and other medical providers for this condition but, according to Plaintiff's self-reporting, he has obtained no relief from them.  Thomas Decl. ¶ 19.

Plaintiff describes numerous prior consultations in 2007 and 2008 with orthopedic, neurology and pain management experts and alleges that none of those medical doctors determined that his peroneal nerve damage was due to the knee surgery, as Defendants have claimed.  He further states that peroneal nerve damage is a "rare" side effect of knee surgery and suggests that it is therefore impossible that his symptoms can be attributed to his previous knee surgery or damage to the peroneal nerve.  Defendants assert that this argument is misguided.  Specifically, according to the record evidence, an EMG report dated March 24, 2009, shows that Plaintiff does have peroneal nerve damage.  The peroneal nerve emanates from around the area of the knee as a branch of the sciatic nerve; there is no peroneal nerve in the back.  According to Dr. Barnett, calf numbness can arise from damage to the sensory branches of the peroneal nerve, but pain and numbness in the calf may also be symptoms associated with nerve compression at the level of the spine.  He acknowledges that Plaintiff may have some sensory deficits associated with either or both of these conditions, that is, he may have symptoms arising from compromise

of the peroneal nerve and he may be experiencing symptoms from traction on nerve fibers coming from his low spine or throughout the sciatic nerve.   But, in either case, it is Dr. Barnett's professional opinion that, based upon his experience and training, the evidence in the medical record and the radiographic findings, Plaintiff does not suffer from a condition that is "even close" to warranting surgical intervention.   Barnett Decl. Supp. Reply ¶ 14.

Based on the above evidence, the Court finds that Plaintiff has not raised a triable issue of material fact with respect to whether Defendants' diagnosis and treatment of his left leg pain was medically unacceptable under the circumstances and whether they chose their course of action in conscious disregard of an exceptional risk to his health.   Toguchi, 391 F.3d at 1058. Accordingly, Defendants are GRANTED summary judgment on this claim.

> 6.   Warden Jacquez

In addition to the above claims that he was not provided with adequate medical care by Defendants, Plaintiff maintains that Defendant Warden F. Jacquez acted with deliberate indifference because he is responsible "overall" for the actions of his employees, and because he did not approve Plaintiff's transfer to another prison where he could receive proper medical care.   Compl. ¶ 9.[9]

---

[9] Jacquez was the Warden at PBSP from September 2008 until January 2010, and was the Chief Deputy Warden at PBSP from January 2010 until his retirement from the CDCR in July 2011.

United States District Court
For the Northern District of California

Plaintiff's claim fails because, as a matter of law, there is no respondeat superior liability under 42 U.S.C. § 1983.  That is, under no circumstances can a defendant be held liable solely because he is responsible for the actions or omissions of another.  See Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).  A supervisor may be liable under § 1983 upon a showing of either his personal involvement in the constitutional deprivation or a sufficient causal connection between his wrongful conduct and the constitutional violation.  Henry A. v. Willden, 678 F.3d 991, 1003-04 (9th Cir. 2012).  In order to establish such liability, a plaintiff must show that the supervisor had the requisite state of mind, which turns on the requirement of the particular claim and, more specifically, on the state of mind required by the particular claim, not on a generally applicable concept of supervisory liability.  Oregon State University Student Alliance v. Ray, 699 F.3d 1053, 1071 (9th Cir. 2012).

Here, Plaintiff has not presented evidence that raises a triable issue with respect to whether Jacquez acted with deliberate indifference to his serious medical needs.  Instead, the undisputed evidence shows that Jacquez's only involvement with Plaintiff was his attendance at three Institutional Classification Committee (ICC) meetings where the status and custody levels of inmates in segregated housing, including Plaintiff, were discussed.  Decl. F. Jacquez Supp. Mot. Summ. J. (Jacquez Decl.) ¶¶ 4-5.  The record shows that the ICC members discussed Plaintiff's security status and custody issues with him, including criteria for his segregated housing status at PBSP, but it does not reflect that any ICC member, including Jacquez, spoke with him

31

**United States District Court**
For the Northern District of California

about a request to change prison institutions to seek different medical treatments for his back pain or a transfer for any other medical purpose.  Jacquez Decl. ¶ 5 & Ex. A.

Additionally, the undisputed evidence shows that, as Warden or Chief Deputy Warden, Jacquez was not responsible for determining the appropriate course of medical treatment for inmates at PBSP, he is not a medical doctor, he has never practiced medicine and he did not have the responsibility of employing or dismissing any medical personnel.  Jacquez Decl. ¶ 7.

Based on the above, summary judgment is GRANTED to Jacquez on Plaintiff's claim of deliberate indifference.

III. Qualified Immunity

Defendants argue that they are entitled to qualified immunity.  In this case, Plaintiff seeks both injunctive relief and money damages.  "Qualified immunity is only an immunity from suit for money damages, and does not provide immunity from a suit seeking declaratory or injunctive relief."  Hydrick v. Hunter, 669 F.3d 937, 939-40 (9th Cir. 2012).  Accordingly, Defendants are not entitled to qualified immunity on Plaintiff's injunctive relief claims.

With respect to Plaintiff's damages claims, the defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  A court considering a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and

United States District Court

For the Northern District of California

whether the right was clearly established, such that it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. See Pearson v. Callahan, 555 U.S. 223, 236 (2009).

On the facts presented herein, viewed in the light most favorable to Plaintiff, Defendants prevail as a matter of law on their qualified immunity defense because the record establishes no constitutional violation. Even if a constitutional violation did occur, however, Defendants reasonably could have believed their conduct was lawful. Specifically, it would not have been clear to Defendants that they failed to take reasonable steps to abate a substantial risk of harm to Plaintiff by providing him with the above-described care and treatment for his back and leg pain and other symptoms.

Accordingly, Defendants are entitled to qualified immunity, and their motion for summary judgment is GRANTED for this reason as well.

IV.  Supplemental State Law Claims

In addition to Plaintiff's claims that Defendants acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment, he raises supplemental state law claims of medical negligence.

The elements of a claim for professional negligence, also referred to as medical malpractice, under California law, are: "(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury;

33

and (4) actual loss or damage resulting from the professional's negligence." Budd v. Nixen, 6 Cal.3d 195, 200 (1971), superseded in part by Cal. Civ. Proc. Code § 340.6.  Although prison employees often enjoy immunity from state tort liability, California law expressly provides: "Nothing in this section exonerates a public employee who is lawfully engaged in the practice of one of the healing arts under any law of this state from liability for injury proximately caused by malpractice." Cal. Gov't. Code § 845.6.

Defendants argue that the medical care they provided to Plaintiff fell within the professional standard of care and that they did not cause him injury.  The evidence in the record, described in detail above, supports the conclusion that Defendants were not negligent in treating Plaintiff's back pain, knee pain and left leg numbness.  Alternatively, even if Defendants had been negligent, Plaintiff has not presented evidence which shows that he suffered a cognizable loss or damage related to their care or lack thereof.  Accordingly, Defendants' motion for summary judgment on Plaintiff's medical negligence claims is GRANTED.

V.   Motion for Appointment of Counsel

Plaintiff moves for the appointment of counsel to represent him in this action.  Because the Court has ruled in favor of Defendants with respect to all claims against them, Plaintiff's claim is moot and, therefore, is DENIED.

CONCLUSION

For the foregoing reasons, the Court orders as follows:

1.   Defendants' motion for summary judgment is GRANTED with respect to all claims brought against them.  Docket no. 23. Judgment shall be entered in favor of all Defendants and against

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1 | Plaintiff.

2 |      2.    Plaintiff's motion to compel is DENIED.  Docket no. 26.

3 |      3.    Plaintiff's motion for the appointment of counsel is

4 | DENIED.  Docket no. 40.

5 |      The Clerk of the Court shall enter judgment and close the

6 | file.

7 |      This Order terminates Docket nos. 23, 26 and 40.

8 |      IT IS SO ORDERED.

9 | Dated:  9/11/2013

10 |                                  CLAUDIA WILKEN
                                   United States District Judge

35